Barbara ALLEN as Executrix of the
Estate of Gregg Geddes Allen,
deceased, Plaintiff-Appellant,

v.

ALLSTATE INSURANCE COMPANY,
Defendant-Appellee.

No. 79–4008.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 12, 1980.

Decided Sept. 14, 1981.

As Amended on Denial of Rehearing
Dec. 14, 1981.

Cavan Hardy, Sacramento, Cal., argued for plaintiff-appellant; Woodrow W. Kitchel, Hardy, Erich & Brown, Sacramento, Cal., on brief.

Leo Walcom, Walcom & Harmon, San Francisco, Cal., for defendant-appellee.

Before PECK *, GOODWIN and NORRIS, Circuit Judges.

JOHN W. PECK, Circuit Judge.

The issue on appeal is whether the trial court correctly ruled that no reasonable settlement offer had been made to appellee Allstate. Having so ruled, the trial judge entered a judgment notwithstanding a jury verdict finding Allstate liable for bad faith in refusing to settle a claim against one of Allstate's insureds. Barbara Allen appeals from this JNOV. Diverse citizenship is the basis of federal jurisdiction, 28 U.S.C. § 1332; California substantive law controls.

The following facts are not materially disputed. On April 14, 1970, Gregg Allen, the appellant's husband, suffered grave injuries in an auto accident while a passenger in a car driven by Calvert Taylor, Allstate's

insured. Six months after this accident, Gregg Allen died as the result of his injuries, and Barbara Allen brought a wrongful death action in state court. Plaintiff Allen named as a codefendant Everett Taylor, Calvert Taylor's father and employer; Allen alleged that Calvert Taylor was acting in the course and scope of his employment, and that Everett Taylor was thus vicariously liable for his employee's negligence. During the trial of the wrongful death action, Everett Taylor's insurer, Great American, settled the suit against Everett for $100,000. The action against Calvert Taylor proceeded to a judgment of $550,000 against Calvert Taylor personally. Allstate then paid its policy limit of $100,000.

Prior to this state trial, Allstate had not responded to a letter from Allen's attorney offering to settle Allen's wrongful death action against Calvert Taylor for $100,000. After Calvert's personal liability had been established, he assigned to Barbara Allen his rights against Allstate, and Allen filed the present action alleging bad faith in Allstate's handling of her claim against Calvert Taylor. Trial of this action, as noted, culminated in the grant of a JNOV to Allstate, from which Allen now appeals.

Appellate review of a JNOV is, of course, severe. The present JNOV may stand only if the evidence and its inferences, viewed in the light most favorable to Allen, can support only the conclusion that Allstate was legally entitled to a favorable judgment. *See, e. g., Davison v. Pacific Inland Navigation Co., Inc.,* 569 F.2d 507, 509 (9th Cir. 1978).

I

Under California law, an insurer's "bad faith" in the handling of a claim against an insured is actionable as a breach of an "implied covenant of good faith and fair dealing" between insurer and insured. *Crisci v. Security Ins. Co.,* 66 Cal.2d 425, 430, 58 Cal.Rptr. 13, 16–17, 426 P.2d 173,

---

* Honorable John W. Peck, Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

176–177 (1967). What is "good faith" or "bad faith" on an insurer's part has not yet proved susceptible to pat legal definition. An insurer's "good faith" is essentially a matter of fact. *See Kinder v. Western Pioneer Ins. Co.*, 231 Cal.App.2d 894, 900, 42 Cal.Rptr. 394, 397 (1965), and cases cited there. Thus, due deference must be granted to the trier-of-fact in this case—the jury.

■ The legal background of the "bad faith" picture in California is broadly painted. When there is considerable risk of substantial recovery beyond an insured's policy limits, a conflict of interest arises between insurer and insured: although settlement within policy limits will always be in the insured's interest, the insurer, whose potential liability is fixed by the policy, may have little to lose by going to trial on the issue of liability, even if an opportunity to settle within policy limits exists. *Crisci, supra*, 66 Cal.2d at 432–433, 58 Cal.Rptr. at 17–18, 426 P.2d at 177–178. Therefore, when an insurer undertakes its insured's defense, a "duty to settle is implied in law to protect the insured from exposure to liability in excess of coverage as a result of the insurer's gamble—on which only the insured might lose." *Murphy v. Allstate Ins. Co.*, 17 Cal.3d 937, 941, 132 Cal.Rptr. 424, 426, 553 P.2d 584, 586 (1976). This duty is breached when an insurer, in trying to resolve a conflict of interest, gives less consideration to its insured's financial interests than to its own. *Crisci, supra*, 66 Cal.2d at 432–433, 58 Cal.Rptr. at 18, 426 P.2d at 178; *Merritt v. Reserve Ins. Co.*, 34 Cal.App.3d 858, 873, 110 Cal.Rptr. 511, 521 (1973).

■ California courts look to the following criteria in deciding whether an insurer has struck an improper balance of its own and its insured's interests:

the strength of the injured claimant's case on the issues of liability and damages; attempts by the insurer to induce the insured to contribute to a settlement; failure of the insured to properly investigate the circumstances so as to ascertain the evidence against the insured; the insurer's rejection of advice of its own attorney or agent; failure of the insurer to inform the insured of a compromise offer; the amount of financial risk to which each party is exposed in the event of a refusal to settle; the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and any other factors tending to establish or negate bad faith on the part of the insurer.

*Merritt, supra*, 34 Cal.App.3d at 876, 110 Cal.Rptr. at 523 (quoting *Brown v. Guarantee Ins. Co.*, 155 Cal.App.2d 679, 689, 319 P.2d 69 (1957) (footnote omitted).

■ In the present case, trial testimony showed that Allstate's district manager had estimated that Allstate's chances of losing a trial of Allen's wrongful death action were between 40% and 60%, and that a judgment of $500,000, or five times Allstate's policy limit, might be entered against Calvert Taylor if Allen won in court. Allstate nevertheless chose to rely on its attorney's assertion that Allstate's case was a "100% winner." The attorney's prediction was based on his belief that Gregg Allen had assumed the risk of injury by riding with an intoxicated driver—Calvert Taylor. Calvert Taylor had, however, denied being intoxicated, and his wife had told Allstate that Calvert did not look or act drunk on the night of the accident.[1] In these circumstances, a jury would be permitted to find that Allstate's reliance on the advice of its attorney was the result of wishful thinking rather than a good faith balancing of its own and its insured's interests.

Correspondence between Allstate and its attorney showed the attorney believed that because Allen's wrongful death action had been bifurcated into separate liability and damage stages, Allstate could postpone any settlement until its insured's personal liability had been established and could still

---

1. A test of Calvert Taylor's blood alcohol level after the accident yielded a figure of .12. This was the basis for a police estimate of a blood alcohol level of .18 at the time of the accident. Allen produced evidence at trial to show that the extrapolation technique used by the police was flawed, and yielded an exaggerated level for the time of the accident.

evade liability for bad faith in handling Allen's claim. The belief could only rest on the assumption that Allen, as a victorious plaintiff, would be as willing to settle within Allstate's policy limits as she was when but a hopeful one. Given Allen's obvious and extensive losses, only slight reflection on Allstate's part would have been needed for Allstate to realize that its own (and its insured's) negotiating strength would be weakened if not destroyed if the liability stage of the wrongful death action were lost. There was a sufficient basis for the jury to conclude that Allstate had been far more solicitous of its own financial interests than of its insured's.

## II

The trial judge, in granting the JNOV, relied on two opinions of the California Court of Appeals. The first, *Merritt, supra,* was cited for the proposition that "an unconditional offer to settle is required in order to find bad faith liability." *Merritt,* however, does not mention "unconditional" settlement offers but rather states that no occasion for an insurer's bad faith arises until a conflict of interests develops between insurer and insured. No such conflict arose in *Merritt* because no party "ever advance[d] any suggestion that settlement could be profitably discussed." 34 Cal. App.3d at 877, 110 Cal.Rptr. at 524.

The trial judge apparently believed that Allen's offer of settlement, contained in a letter of July 8, 1971, did not meet the supposed requirements of *Merritt* because no mention was made of resolution of a possible workers' compensation claim by Allen's employer. The district court supported this conclusion by citation of *Coe v. State Farm Mut. Auto. Ins. Co.,* 66 Cal.

App.3d 981, 136 Cal.Rptr. 331 (1977). *Coe* noted that under the California Labor Code §§ 3859, 3860 (West 1971), if workers' compensation benefits have been paid, no settlement of an injured employee's claim is valid without notice to, and the consent of, the claimant's employer.[2] *Coe* reversed a judgment holding an insurer liable for bad faith in failing to accept a settlement offer that contained no mention of disposition of workers' compensation claims. The settlement offer made by Allen's attorney in this case likewise contained no such information.

■ There is, however, a significant factual distinction between *Coe* and Allen's case: in *Coe,* the insurer's response to a settlement offer noted that the offer was silent concerning release of workers' compensation claims. The plaintiff's attorney did not offer any assurance on the subject. See 66 Cal.App.3d at 993, 136 Cal.Rptr. at 337. Here, Allstate did not respond to Allen's offer by pointing out any deficiency in the offer's scope; rather, Allstate ignored the offer, and the evidence supports the conclusion that Allstate chose to do so as a calculated gamble on which only its insured could lose.

As we read it, *Coe* does not require claimants against insureds to begin settlement overtures with letter-perfect offers to which insurers need only respond "Yes" or "No." An insurer's duty of good faith would be trifling if it did not require an insurer to explore the details of a settlement offer that could prove extremely beneficial to its insured.[3]

None of the other arguments raised by Allstate—arguments not addressed by the trial judge in his memorandum opinion—supports a JNOV for Allstate.

**2.** In 1971, these sections were amended to allow a separate settlement by the injured employee, subject to the employer's compensation rights. See Cal. Lab. Code §§ 3859, 3860 (West Supp. 1980).

**3.** On this point, the testimony of Allstate's attorney is revealing: he stated that he didn't ask Allen's attorney about reimbursement of the workers' compensation carrier after Allen's of-

fer was made because he didn't want "to stir up another claim" against Allstate's insured.

After Allstate lost the liability half of the wrongful death action, Allstate's attorney offered Allen $100,000. in settlement of the action. No mention was made of the workers' compensation claim, which, in Allstate's attorney's words, was a matter of "detail" that was not discussed because of Allen's refusal of Allstate's offer. See Transcript at 269.

The judgment is reversed. The cause is remanded and the district court is directed to enter judgment on the jury verdict.

Costs to appellant.

## ON REHEARING

Upon consideration of appellant Allen's petition for rehearing, it is ordered that this court's mandate be amended to require post-judgment interest from February 16, 1978. Such interest is allowable under California law. *See Big Bear Properties, Inc. v. Gherman,* 95 Cal.App.3d 908, 157 Cal.Rptr. 443, 446–47 (1979).